EDWARD A. APPLEGATE AND CHARLOTTE M. APPLEGATE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; DANIEL S. BELL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Applegate v. Commissioner
Docket Nos. 8731-83, 10151-83.
United States Tax Court
T.C. Memo 1985-504; 1985 Tax Ct. Memo LEXIS 128; 50 T.C.M. (CCH) 1172; T.C.M. (RIA) 85504; September 25, 1985. Edward A. Applegate, pro se in docket No. 8731-83. Daniel S. Bell, pro se in docket No. 10151-83. Matthew Magnone and John W. Wertz, for the respondent. PARKER MEMORANDUM *129 FINDINGS OF FACT AND OPINION PARKER, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' 1979 Federal income taxes and a section 6652 [1] addition to tax as follows: Addition to Tax
Petitioner(s)
Docket No.
Deficiency
Sec. 6652
Edward A. and Charlotte M.
Applegate
8731-83 $2,742
Daniel S. Bell
10151-83
[2] 2,105
$10
*130 The sole issue for decision is whether the check in the amount of $5,400 that Mr. Bell issued to Mr. Applegate was payment for services rendered by Applegate to Bell or was payment for personal injuries sustained by Applegate. If we determine that the check was payment for services rendered, the Applegates must include the amount thereof in their gross income, and Bell may deduct such amount pursuant to section 162. If we determine that the check was payment for personal injuries, the Applegates need not include the amount thereof in their gross income, and Bell may not deduct such amount. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners Edward A. Applegate (Mr. Applegate) and Charlotte M. Applegate (Mrs. Applegate), husband and wife, resided in South Orange, New Jersey, at the time they filed their petition in this case. The Applegates timely filed their joint 1979 Federal income tax return (Form 1040) with the Internal Revenue Service. Charlotte M. Applegate is a petitioner in this case solely because she filed a joint return with her *131 husband. Petitioner Daniel S. Bell (Mr. Bell) resided in East Orange, New Jersey at the time he filed his petition in this case. Petitioner Bell timely filed his individual 1979 Federal income tax return with the Internal Revenue Service. Mr. Bell and Mr. Applegate have known each other since grammar school, and Mr. Applegate considers Mr. Bell a close friend as well as a friend of the family. During 1979 Mr. Bell was a practicing attorney associated with the law firm of Bell, Adubato and Ligham. [3] Mr. Applegate was a paralegal and worked for Mr. Bell during this period. This, however, was not Mr. Applegate's primary source of income for the year in issue. [4]
*132 Mr. Applegate had a very informal working arrangement with Mr. Bell. Mr. Applegate did not keep regular working hours but worked as needed on a part-time basis. Furthermore, Mr. Bell and Mr. Applegate had no formal agreement or understanding as to Mr. Applegate's rate of compensation. Neither Mr. Applegate nor Mr. Bell kept any record of the hours Mr. Applegate worked, but Mr. Applegate was at Mr. Bell's office quite often and worked a substantial number of hours. Mr. Bell had no idea how many cases or files Mr. Applegate had worked on or the total number of hours Mr. Applegate had worked for him. Periodically during 1979 Mr. Bell issued checks to Mr. Appelegate to compensate him for his paralegal services. [5] On February 7, and again on July 26, 1979, Mr. Bell issued a check to Mr. Applegate in the amount of $1,000. On August 8, 1979, Mr. Bell issued a check in the amount of $650 to Mr. Applegate also for compensation. Mr. Applegate specifically requested these amounts for the services he had performed. Mr. Bell simply took Mr. Applegate's word in writing checks for these amounts, and Mr. Bell did not use any mathematical computation or formula in determining them. Mr. *133 Bell was satisfied that Mr. Applegate had more than earned these amounts. On September 25, 1979, Mr. Bell issued a check in the amount of $5,400 to Mr. Applegate. This check was issued in response to a series of events that began on July 17, 1979. On July 17, 1979, Mr. Applegate was dictating to Adele O'Remus (Mrs. O'Remus), a securetary who worked for Mr. Bell. Florence Ageitos, an attorney who also worked for Mr. Bell, made some type of physical contact with Mr. Applegate as she passed by him. According to Mr. Applegate, Ms. Ageitos "assaulted and battered him," knocking him over Mrs. O'Remus' desk and into a typewriter. He claimed to have sustained personal injuries from this incident. However, he never went to a doctor in connection with the incident and he submitted no evidence to substantiate these injuries other than his and his wife's wholly *134 uncorroborated, self-serving testimony. According to Mr. Bell, the incident between Mr. Applegate and Ms. Ageitors amounted to nothing more than her elbow touching him. Ms. Ageitos is 5 feet 1 inch in height and weighs about 110 pounds. Mrs. O'Remus testified that as Ms. Ageitos walked past Mr. Applegate on her way to the file room, Mr. Applegate made an "umph" sound and claimed she had hit him. Mrs. O'Remus immediately went into Mr. Bell's office and said, "What are we running here, Romper Room?" We are satisfied that the whole incident has been blown out of proportion, and that Mr. Applegate did not sustain any personal injuries from his physical contact with Ms. Ageitos. As a result of the incident on July 17, 1979, Mr. Applegate instituted a civil action on July 20, 1979, against Ms. Ageitos for assault and battery. He claimed that Ms. Ageitos did "assault, batter, strike and beat" him and that he was "seriously injured and maimed" as a result. Ms. Ageitos was timely served with a copy of the summons and complaint and later served with a notice to take oral depositions. Mr. Applegate sent interrogatories to her and also filed a Subpoena Ad Testificandum on September 11, 1979 requesting *135 Adele O'Remus to appear for a deposition. In preparation for the trial of the assault and battery case, Mr. Applegate, Mr. Bell, and Mrs. O'Remus met in Mr. Bell's office on or around September 23, 1979, so that Mr. Applegate could obtain a written statement from Mrs. O'Remus concerning his altercation with Ms. Ageitos. Mr. Applegate began dictating to Mrs. O'Remus his version of the July 17th incident. When Mrs. O'Remus refused to type what in her opinion was an inaccurate account of the incident, Mr. Applegate became upset and left the office without the statement. Mr. Applegate telephoned Mr. Bell the next day. He told Mr. Bell he wanted to sever their relationship and also wanted to be paid for all the work he had done but for which he had not been compensated. Mr. Applegate agreed to accept the sum of $5,400 in full satisfaction for these past services. He also agreed to settle his lawsuit with Ms. Ageitos for an extra $100. [6]
On September 25, 1979, Mr. Applegate *136 and Ms. Ageitos agreed to dismiss the lawsuit against Ms. Ageitos with prejudice and without costs to either party. On the same day Mr. Bell met with Mr. and Mrs. Applegate on the patio of their home to execute and exchange releases Mr. Bell and prepared. Mr. Bell prepared five, one-page, standard form releases consisting of two reciprocal releases between Mr. Bell and Mr. Applegate, two reciprocal releases between Mr. Applegate and Ms. Ageitos, and a release from Mr. Applegate to Mrs. O'Remus. [7] For consideration in the amount of $100, which was paid by Mr. Bell, Mr. Applegate executed and Mr. Bell notarized a release to Ms. Ageitos. In consideration of the sum of $5,400, which was also paid by Mr. Bell, Mr. Applegate executed and Mrs. Applegate notarized an original and at least one photocopy duplicate of a release to Daniel S. Bell and the law firm of Bell, Adubato and Ligham. This release, like the others, was a one-page, standard printed form that provided spaces for the parties to fill in the appropriate names, dates, consideration, and any specific provisions. Mr. Bell personally typed in the pertinent information on all the releases prior to arriving at the Applegate's *137 home. On the original release to Mr. Bell and his firm, Mr. Bell added the following typewritten language to the release clause: "for all paralegal services rendered by Edward A. Applegate to the office of Bell, Adubato and Ligham and Daniel S. Bell." This typewritten language had several partially corrected but noticeable typographical errors, several spacing irregularities between words, and irregular spacing between lines. Mr. Bell made copies of the releases and took both the originals and the copies to the Applegates' home. After the releases were executed and exchanged, Mr. Bell gave a copy of each release to Mr. Applegate. On Schedule C attached to his 1979 return, Mr. Bell claimed a deduction for the $5,400 he paid to Mr. Applegate. The Applegates, on the other hand, did not include this amount in the gross income on the Schedule C for Mr. Applegate's paralegal activities, or in any other place on their 1979 return. [8]
*138 During an audit of Mr. Bell's 1979 return in late 1980 or early 1981, respondent's agent questioned him concerning the deduction he had claimed with respect to the $5,400 payment to Mr. Applegate. To substantiate the deduction, Mr. Bell produced the release executed by Mr. Applegate in consideration of the $5,400 payment. The release clause contained the typewritten language "for all paralegal services rendered by Edward A. Applegate to the office of Bell, Adubato and Ligham and Daniel S. Bell" discussed above. When informed of Mr. Bell's position by respondent's agent, Mr. Applegate insisted that the payment of $5,400 was not for past services but was payment for personal injuries he sustained from the incident with Ms. Ageitos. Mrs. Applegate then signed an affidavit to the effect that the release clause did not contain the typewritten language pertaining to services when Mr. Applegate signed and she notarized the release. In a letter to Mr. Bell, dated September 7, 1981, Mr. Applegate stated that he intended to file an action to set aside the release on the basis of fraud because Mr. Bell inserted the typewritten language pertaining to past legal services in the release clause *139 after it was executed. [9]
By statutory notice of deficiency dated April 1, 1983, respondent determined that the amount of $5,400 Mr. Bell paid to Mr. Applegate was not deductible by Mr. Bell in 1979 because he had not established that it was an ordinary and necessary business expense.Consequently, respondent increased Mr. Bell's taxable income for 1979 in the amount of $5,400. By statutory notice of deficiency dated April 1, 1983, respondent determined that the $5,400 Mr. Applegate received in 1979 from the law office of Bell, Adubato and Ligham was compensation for paralegal services. Consequently, respondent increased Mr. Applegate's taxable income for 1979 in the amount of $5,400. Respondent has taken these inconsistent positions to protect the fisc, and respondent is essentially in the position of a stakeholder in this proceeding. ULTIMATE FINDING OF FACT The check issued by Mr. Bell to Mr. Applegate dated September 25, 1979 in the amount of $5,400 was compensation for services rendered by Mr. Applegate. OPINION The issue in this case is purely factual. The *140 Applegates argue that they are entitled to exclude the $5,400 Mr. Bell paid to Mr. Applegate from their gross income for 1979. They assert that the $5,400 that Mr. Bell paid to Mr. Applegate on September 25, 1979, pursuant to the release, represented payment for personal injuries sustained by Mr. Applegate in the altercation with Ms. Ageitos. Mr. Bell argues that the sum of $5,400 paid to Mr. Applegate pursuant to the release represented payment to Mr. Applegate for paralegal services rendered. The disputed release dated September 24, 1979 was signed by Mr. Applegate and notarized by Mrs. Applegate. The release provided for payment in the sum of $5,400 to Mr. Applegate "for all paralegal services rendered by Edward A. Applegate to the office of Bell, Adubato and Ligham and Daniel S. Bell." That language was typed on the standard release form. Mr. Applegate received a check from Mr. Bell in the amount of $5,400 at the time he signed that release. Mr. and Mrs. Applegate persistently asserted at the trial that the release clause did not contain the typewritten language "for all paralegal services rendered by Edward A. Applegate to the office of Bell, Adubato and Ligham and Daniel *141 S. Bell" at the time Mr. Applegate signed the release. Mrs. Applegate testified she was positive the release did not contain the above typewritten language at the time the release was executed. We are satisfied, from the record as a whole, that she is wrong. [10]
Mr. Applegate could not produce any executed copy of the release that did not contain the disputed typewritten language.Mr. Bell testified, and we have found as a fact, that he gave Mr. Applegate a copy of each release that was signed on September 25, 1979, on the patio of the Applegates' home. We find Mr. Bell's testimony wholly credible. Mr. Applegate admits that he used his own photocopying machine to make copies of some of the releases at the time they were signed, but denies ever making or receiving a copy of the release that is presently in dispute. Mrs. Applegate also admitted that Mr. Applegate did receive copies of some of the releases, but, of course, could not remember which copies he had received. At trial, however, Mr. Bell offered and the Court received into evidence the original release *142 and a photocopy duplicate. Both documents contained the typewritten language that the Applegates persistently argue the not in the release when Mr. Applegate signed and Mrs. Applegate notarized it. Moreover, both the original release and the photocopy duplicate bore the original signatures of both Mr. Applegate and Mrs. Applegate. The "typewritten language" on the photocopy duplicate was photocopied and not original typing. Moreover, the language land-printed under Mrs. Applegate's signature in regard to her commission as a notary differs on the original release and the photocopy duplicate, which shows that the rest of the release was photocopied with the "typewritten language" before Mr. Applegate signed that photocopy duplicate and before Mrs. Applegate signed it as notary. The only other difference between the original release and the photocopy duplicate is that the original has blue lines down each side whereas those lines show up as black on the photocopy duplicate. The typewritten language on the original release has several partially corrected but noticeable typographical errors, several spacing irregularities between words, and irregular spacing between lines. The *143 typewritten language on the photocopy duplicate release displayed the identical peculiarities as the original release. Mr. Bell testified, and we found as facts, that he typed the release himself, made copies from the original, and then Mr. Applegate signed and Mrs. Applegate notarized both the original release and the photocopy duplicate. At trial, neither Mr. Applegate nor Mrs. Applegate could explain the existence of the typewritten language on both the original release and the photocopy duplicate when both documents bore their original signatures. The only logical explanation is that the typewritten language was in fact typed on the original release and that original release was photocopied before Mr. and Mrs. Applegate signed the original and signed the photocopy duplicate of the release. We think this is the only possible explanation. It would have been impossible for Mr. Bell to have inserted the typewritten language into both the original and the photocopy duplicate after they had been signed and notarized by Mr. and Mrs. Applegate, respectively. The peculiarities caused by Mr. Bell's poor typing are too unique to have been manually duplicated. Moreover, the typewritten *144 language on the photocopy duplicate is photocopied and not original typing. Therefore, we conclude that the release from Mr. Applegate to Mr. Bell dated September 24, 1979, with a stated consideration in the amount of $5,400, contained the phrase "for all paralegal services rendered by Edward A. Applegate to the office of Bell, Adubato and Ligham and Daniel S. Bell" at the time the release was signed by Mr. Applegate and notarized by his wife. We simply do not believe the Applegates' testimony to the contrary, and the physical evidence, which they did not and could not explain away, supports Mr. Bell's testimony. Section 61 provides in part that gross income means all income from whatever source derived, including compensation for services. Sec. 61(a)(1). Section 162 provides in part that a reasonable allowance for salaries or other compensation for personal services actually rendered shall be allowed as a deduction as an ordinary and necessary expense for the taxable year in which they are paid or incurred. Sec. 162(a)(1). It is undisputed that Mr. Applegate worked as a paralegal for Mr. Bell during 1979 and Mr. Applegate received several checks periodically throughout *145 1979 as compensation for these services. Neither Mr. Applegate nor Mr. Bell kept any time sheets or other record regarding Mr. Applegate's employment that could have substantiated the hours worked or the value of the services rendered. We are satisfied that the check for the sum of $5,400 issued to Mr. Applegate by Mr. Bell was in fact compensation for services. Neither respondent nor the respective petitioners have raised any issue as to the reasonableness of the amount of such compensation. [11]
*146 Accordingly, we conclude that the check in the amount of $5,400 that Mr. Applegate received from Mr. Bell on September 25, 1979, was compensation for services rendered. Consequently, the Applegates must include such amount in their gross income for 1979. Sec. 61(a)(1). Similarly, Mr. Bell is entitled to a deduction for 1979 in the same amount. Sec. 162(a)(1). To reflect the foregoing, Decision will be entered under Rule 155 in docket No. 10151-83.
Decision will be entered for respondent in docket No. 8731-83.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure. ↩
2. The statutory notice of deficiency issued to petitioner shows a deficiency in the amount of $2,105. However, the Notice of Deficiency-Waiver (Form 4089) and the Statement-Income Tax Changes (Form 5278) also reflect a refundable credit adjustment of $903 and a net deficiency for petitioner Bell in the amount of $1,202, plus the section 6652 addition. Petitioner Bell has conceded the section 6652 addition. There was some indication in the record that respondent may have agreed to certain other credits, not otherwise identified, that respondent and Mr. Bell will handle in a Rule 155 computation.↩
3. Petitioner Bell reported the income from his law practice as a sole proprietor (Schedule C) and listed his business name as Bell, Adubato & Ligham. ↩
4. For 1979, Mr. Applegate reported gross income in the amount of $137,438, of which $122,909 constituted supplemental income reported on Schedule E as rent receipts and royalty payments from commercial properties. He reported on Schedule C $2,000 from his paralegal services, and claimed business expenses of $3,057 in connection with his paralegal work. Those expenses included depreciation on his law books, typewriter, photocopy machine, etc., and professional dues and publications.↩
5. Mr. Applegate testified he did not request wages for his services for the year in issue because his accountant had estimated that his income for that year would exceed an amount of $100,000. However, Mr. Applegate concedes that he accepted at least $2,000 from Mr. Bell as compensation for services rendered as a paralegal.↩
6. Mr. Applegate, however, denied ever making such a request and agreeing to accept such amounts for the stated purposes. The Court found Mr. Bell's testimony to be more credible than that of Mr. Applegate.↩
7. Only the release from Mr. Applegate to Mr. Bell in consideration of $5,400 is in issue herein. Although the parties testified the releases were executed on September 25, 1979, three of the releases are dated September 24, 1979.↩
8. The Applegates did include on the Schedule C the two $1,000 amounts Mr. Bell paid Mr. Applegate on February 7, and July 26, 1979. However, they did not include in gross income the $650 amount Mr. Bell paid Mr. Applegate on August 8, 1979. Respondent did not make any adjustment in either Bell's or the Applegates' income for this amount in determining their deficiencies. Also, the record does not indicate the nature of the check dated April 5, 1979, in the amount of $68.02 issued by Mr. Bell to Mr. Applegate.↩
9. We note the record does not indicate that Mr. Applegate ever filed an action to set aside the release.↩
10. We found Mrs. Applegate's recollection to be extremely selective, which greatly diminished her credibility.↩
11. The only issue raised by the Applegates was whether or not the release contained the typewritten language "for all paralegal services rendered by Edward A. Applegate to the office of Bell, Adubato and Ligham and Daniel S. Bell" at the time Mr. Applegate signed the release. We have found that it did. The Applegates do not argue fraudulent inducement or misrepresentation regarding the validity of the release. They simply argue the disputed typewritten language was not contained in the release when it was executed. Under New Jersey state law, it is the general rule that the signing of a written instrument, such as a release, raises a conclusive presumption that the party signing has "read, understood and assented to its terms" and cannot later assert that the "effect of the act of signing was not comprehensible." .↩